## Staunton.

## COMMONWEALTH AND OTHERS v. UNITED CIGARETTE MACHINE CO. (LIMITED).

September 11, 1916.

Absent, Sims, J.*

1. TAXATION—*Intangibles—Situs.*—While, as a general rule, intangible property has no *situs* of its own, and is, therefore, as a general rule, assessable for taxes at the place of its owner, yet where it becomes localized, in the hands of an agent, for instance, in a State different from that of the domicil of its owner, and is used in the State in a *permanent and continuous* business, the maxim *mobilia sequunter personam*, upon which the general rule is based, ceases to apply, insofar as it affects the right of the latter State to impose taxes.

2. TAXATION—*Foreign Corporation—Doing Business in State.*—This State has the right and power to impose taxes upon the capital of a foreign corporation employed in a manufacturing business which the corporation has established and is conducting within the State.

3. FOREIGN CORPORATIONS—*Exclusion from State.*—The State has power to exclude a foreign corporation from doing business within its borders unless it fulfils the conditions prescribed by the State for its admission.

4. TAXATION—*Foreign Corporations—Situs of Credits.*—Where a foreign corporation has an agent within a State by whom investments are made, who collects and transmits them to his principal, the "credits" have a *situs* within the State, and the State has a right and the power to tax them.

5. TAXATION—*Foreign Corporation Domesticated.*—While a statute may not make a foreign corporation a "citizen" within the meaning of the Federal Constitution, it may domesticate it for purposes of taxation, and instead of licensing a foreign corporation to transact business within its borders, a State may, for reasons of its own, adopt the foreign corporation by creating it a domestic corporation, with the same franchises and powers that it exercises in the State of its creation, or with powers that are less or more extensive.

---

* Submitted before Judge Sims took his seat.

6. STATUTES—*Act Broader than Title—Constitutional Law.*—Where the provisions of the body of an act of Assembly are congruous with and germane to its title, and there is a natural connection between the two, the act is not broader than its title in a constitutional sense.

7. CONSTITUTIONAL LAW—*Act Imposing Tax—Code, Section 1103-b—Foreign Manufacturing Company.*—Section 1103-b of the Code, as amended, declaring that certain foreign mining and manufacturing companies which come into this State under its provisions shall, as to its contracts made, and property located within this State, for *all purposes* be deemed and treated as a corporation of this State, does not contravene section 50 of the Constitution, requiring that a law imposing a tax shall specifically state such tax. The statute imposes no tax, but simply puts such foreign corporations on the same footing with domestic corporations, which, of course, includes the right to tax in the same manner, and this is unobjectionable.

8. CONSTITUTIONAL LAW—*Domesticating Foreign Corporation—Code, Section 1103-b.*—Section 1103-b of the Code, as amended, is not in conflict with the powers conferred by the Constitution upon the State Corporation Commission, as to the matters in controversy in the case at bar. As to these matters, the statute only requires that the corporations affected shall be taxed as domestic corporations to the extent that they hold property and conduct business in this State.

9. TAXATION—*Foreign Corporations—Capital—Business Done in State—Case at Bar.*—The "capital" of a foreign manufacturing corporation is taxable in this State under Schedule C of the tax-bill (Acts 1908, p. 322) where it appears, as in the case at bar, that the meetings of its stockholders and of its directors are held in this State, and all of its officers are elected at these meetings of its stockholders; all executive functions are performed here, and its books and all of its securities, evidences of debt, etc., are permanently lodged and kept here, and every function of the company's corporate existence is performed here exclusively, except the single formal act of auditing the company's accounts. The third sub-division of Schedule C of the tax-bill clearly applies to corporations, foreign or domestic, which are engaged in the manufacturing business in this State.

10. TAXATION—*Capital—What Constitutes.*—The word "capital" as used in the tax-bill is defined as follows: "Moneys and credits actively used and employed in carrying on the trade or business, materials, goods, wares and merchandise on hand and all solvent bonds, notes, demands or claims made or contracted in the course of such business during the preceding year, shall be held to be capital in such business."

11. TAXATION—*Foreign Corporations—Tax on Capital.*—Foreign corporations, engaged in the manufacturing business in this State, are required to pay tax on their capital. While section 8 of Schedule C of the tax bill requires the commissioner of the revenue to list the prop-

erty of persons, natural or artificial, *residing* in his district, section 494 of the Code plainly contemplates not only that the property of persons residing in the commissioner's district, but also that of persons, firms and corporations that *reside or do business* in his district, or *have an office* therein shall be listed by him. The question of the residence or domicil of the corporation has nothing to do with the taxation of its capital engaged in business in this State.

12.   TAXATION — *Manufacturing Companies — Capital — Tangible Personal Property—Credits.*—Under the definition of "capital" given in paragraph 10 above, tangible property of a manufacturer on hand for the purpose of manufacture or sale should be listed as "capital" under Schedule C of the tax bill and not as tangible personal property under Schedule B. . Money and credits of all kind actively used and employed in the business should likewise be listed as "capital."

13.   TAXATION—*Omitted Property—Penalty.*—If a person or corporation fails to list property for taxation, and it is subsequently placed on the tax list by order of the court, the penalty of five *per cent.* should be added thereto on the first day of December of each year in which the tax for that year was not paid prior to that date.

14.   TAXATION—*Omitted Property—Interest on Tax.*—Under the provisions of section 508 of the Code interest at the rate of six *per cent.* from the time taxes become due and payable should be added to the amount of the tax extended on property which has been previously omitted from the tax books through the fault of the owner.

Error to a judgment of the Circuit Court of Campbell county on a motion to correct an erroneous assessment of taxes. Judgment for the petitioner. Defendants assign error.

*Reversed.*

The opinion states the case.

*Jno. Garland Pollard,* Attorney-General, *C. B. Garnett,* Assistant Attorney-General, *Volney E. Howard* and *A. H. Light,* for the plaintiffs in error.

*Jno. G. Haythe, F. S. Kirkpatrick, H. Lewis Brown,* and *A. H. Burroughs,* for the defendant in error.

CARDWELL, J., delivered the opinion of the court.

29

This is an application of The United Cigarette Machine Company, Limited, to the Circuit Court of Campbell county, made under the statute, to be exonerated from the payment of State, county and district taxes and levies assessed against it in said county on intangible personal property, bonds, notes and other evidences of debt, owned by the applicant, and on money on deposit in bank to its credit, as shown by the personal property books of the county of Campbell for Blackwater district in said county for the year 1913.

The assessment from which the applicant sought to be exonerated was State, county and district taxes and levies on its bonds, notes and other evidences of debt, and on its money on deposit in bank to the aggregate amount of $1,005,520.

The application was defended and contested by the Commonwealth of Virginia, the county of Campbell and Blackwater district.

Under authority of the case of *Commonwealth* v. *Schemlz*, 114 Va. 364, 76 S. E. 905, the circuit court compelled a disclosure by the applicant of all its property, with a view of making correct assessments and levies thereon under the provisions of sections 508 and 509 of the Code, not only for the year 1913, but for the previous years of 1908, 1909, 1910, 1911 and 1912. This disclosure shows the applicant to have held and owned in Blackwater district, Campbell county, bonds, notes and other evidences of debt, open accounts, materials for the manufacture of machines, cigarette machines and money on deposit, a tabulated statement of which, filed in the record, varying in amount through the six years, was of the aggregate value of $5,182,558.52, all of which had been omitted from assessment and taxation, except that the applicant had been assessed with and had paid taxes on $10,000

for each of the five years from 1908 to 1912, inclusive, assessed under the schedule of "capital of incorporated joint stock companies not otherwise taxed," and this was the only personal property on which the applicant had ever paid any taxes for any year.

Included in the above aggregate of $5,182,558.52 is the value of "machines and parts of same" on hand as of the first of February of each of the six several years as follows: 1908, $29,510.00; 1909, $32,944.10; 1910, $44,211.45; 1911, $44,240.76; 1912, $39,466.17; 1913, $45,440.20. Prior to 1916 the company had been assessed from 1908 to 1912, inclusive, with $10,000 "capital of joint stock companies not otherwise taxed." In the year 1913, being called upon by the commissioner of the revenue for a statement of its taxable assets, the chairman of the company wrote the commissioner of the revenue, denying its liability for taxation on its capital or intangible property, and thereupon the commissioner of the revenue assessed the company for 1913 with $43,356, tangible property, and $1,046,876, intangible property, no return of intangible property having been made by the company on the interrogatory.

The circuit court relieved and exonerated the applicant of the entire assessment for the year 1913, as made by the commissioner of the revenue. On the other hand, the court assessed against the applicant the aforesaid "machines and parts of same" as tangible property owned by it as of the first day of February of five of said several years, but credited it, in each year, with the $10,000 which it had listed for taxation in each of those years as "capital not otherwise taxed," and refused to assess against the applicant the five *per cent.* penalty on the balance thus found due against it for each of said years.

The Commonwealth of Virginia, the county of Campbell and Blackwater district excepted to the opinion and judgment of the court, in so far as it relieved the applicant from the payment of taxes on all of its intangible property which was shown by the evidence to have been owned by it as of the 1st of February of the years 1908 to 1913, inclusive; and in so far as the judgment credited the applicant's tangible personal property with the $10,000 with which it had been assessed by the commissioner of the revenue for the several years as "capital not otherwise taxed," and which had been paid; and in so far as the judgment fails to charge the applicant with the five *per cent* penalty on assessments and levies made against it by the court. These several exceptions to the judgment of the circuit court are made the basis of corresponding assignments of error in the petition of the Commonwealth of Virginia, the county of Campbell and Blackwater district to this court, upon which this writ of error was awarded.

The ground upon which defendant in error, applicant in the lower court, based its right to the relief sought, and upon which the judgment complained of is also based, is that defendant in error being a foregin corporation with its principal office in the city of London, England, it is not subject to taxation in Virginia on its intangible personal property, the order entered by the trial court reciting that the tax laws of Virginia impose a tax on the intangible property of residents only; "that under the authority of *Cowardin* v. *Universal Life Insurance Co.*, 32 Gratt. (73 Va.) 445; *Cook Mining Co.* v. *Thompson*, 110 Va. 369, 66 S. E. 79, and *Loyd* v. *Lynchburg*, 113 Va. 627, 75 S. E. 233, the petitioner (applicant) has its principal office in the city of London, England, and is, therefore, a foreign

corporation and non-resident and not subject to taxation in Virginia on its intangible personal property; that the applicant is not made a domestic corporation and liable to taxation by the provisions of section 1103-b of the Code of Virginia; that, as a consequence it is erroneously assessed on said personal property books for the year 1913, with taxes and levies on its bonds, notes and other evidences of debt and on its money on deposit in bank, to the aggregate amount of $1,003,-520.00   . ."

It appears that this company or association was organized under the laws of England in the year 1899, its charter or "Articles of Association" conferring unlimited privileges and powers of doing business, and contemplates that the whole world should be the field of the company's operations, which is in fact the case. Clause 4 of the charter gives express authority "to enter into any arrangement with any government or authorities—in any part of the world—that may seem conducive to the company's objects, or any of them, and to procure the company to be registered or recognized in any foreign country or place." Clause 18 authorizes the company "to establish agencies and appoint agents in connection with any part of the company's business in any part of the world;" and clause 21 authorizes it "to do all such other things as are incidental or conducive to the attainment of the above objects."

Pursuant to this express authority the company obtained license to establish its legal office and do business at Durmid, Campbell county, Va., and this is its only statutory office or legal *habitat* in the United States.   Here it technically does all of its business, although it actually does a great part of it at its office in the city of Lynchburg.   Durmid, and not London,

England, is in fact the place where the company con-
ducts its world-wide business. Its chief executive
(chairman), its managing director, its American secre-
tary (who is ex-officio treasurer), and their offices and
a duplicate corporate seal are here. The meetings
of its stockholders and of its directors are held here,
and its officers are all elected at these meetings of the
stockholders. All executive functions are performed
here, and its books and all of its securities, evidences
of debt, etc., are permanently lodged and kept here,
there being no function of the company's corporate
existence that is not performed here exclusively, ex-
cept the single formal act of auditing the company's
accounts Its London office is in fact, and to all in-
tents and purposes, a mere branch office, where are
installed an auditor and a few clerks (five or six) in
compliance with a mandatory requirement of the
English law. During the entire existence of this com-
pany, after paying a single year's income tax to the
British government, the entire corpus of its intangible
property of all kinds has been transferred, bodily,
to its headquarters here, after which time, during the
years from 1908 to 1913, both inclusive, it remained
and still is here, and is invested and reinvested and
absolutely controlled, managed and kept here. There
appears with the evidence in this cause the report made
by James W. Gerow, chairman, by order of the board
of directors, to the "twelfth ordinary general meeting
of the stockholders" to be "held at the office of the
company, Durmid, Lynchburg, Virginia, U. S. A., on
the 26th of April, 1911," which, among other things,
say that, "Arrangements have been perfected whereby
the entire management and conduct of the company's
business are now being conducted from its offices in
the United States of America; the result being that

on and after January 1, 1911, the company will be relieved of the payment of income tax to the British government, except in respect of income derived from machines sold for use in the United Kingdom." The facts appearing from this report, along with the other facts proven in this case, show that said company has always removed all of its intangible property from England to its headquarters at Durmid and Lynchburg, Va., including all its income from all of its business, no part of it ever remaining in England, although it had paid an income tax there.

These facts, it is true, are pertinent only in so far as they are helpful in establishing the *situs* or location of the bonds, notes and other evidences of debt, and open accounts and money, involved in this proceeding, there being no doubt about the *situs* of the company's materials, "machines and parts of same," being at Durmid, Blackwater district, Campbell county, Virginia, and properly assessable for taxation there.

The intangible property involved is shown to consist of "notes and bonds," "accounts" and "money," all of which notes and bonds, the books of accounts, and the bank books which evidence the deposits of money in banks, upon all of which interest is paid on monthly balances, are all lodged and kept in the company's offices at Durmid and Lynchburg, and they all adhere to the company's office at Durmid, and their actual *situs* has always been here and has never been in England.

With the foregoing facts before us, with respect to which there is little or no dispute, we will consider plaintiffs in error's assignments of error, the third and last of which involves practically the controlling question in the case, and relates to the rulings of the trial court relieving and exonerating the defendant in error

from the payment of any and all taxes and levies on all of its intangible property; and in failing and refusing to assess against the defendant in error any proper taxes on the intangible property, or on capital used in the conduct of its business in Virginia, the *situs* of which is in this State.

As stated, the ruling of the trial court on this phase of the case is that defendant in error has its principal office in the city of London, England, and is, therefore, a foreign corporation and a non-resident, and not subject to taxation in Virginia, on its intengible personal property—citing three cases decided by this court.

The first of the three cases cited is *Cowardin* v. *Universal Life Insurance Co., supra*, in which it was held that the insurance company was a non-resident, *within the meaning of the foreign attachment law*, and that making a deposit and appointing a citizen of Virginia its agent did not alter its status in that respect.

In the second, *Cook Mining Co.* v. *Thompson, supra*, the holding was that the D. S. Cook Mining Co., chartered under the laws of another State, was a foreign corporation, and that such fact was all that was required by section 2959 of the Code to justify the *issuing of the attachment* against its property.

In the third case, *Loyd* v. *Lynchburg, supra*, "Loyd's Executorial Trustees," was a domestic corporation, and the court held that this corporation had a right, under the Virginia statute, to name the place of its *chief office* in this State, no matter where its administrative office was located, and under the law it had to be taxed where its principal office was established.

None of these cases, as we view them, has any sort of bearing on the questions we are considering in this. It is conceded that defendant in error is a foreign cor-

poration, whose domicil is in London, England, and that the *general rule* is that intangible property has no *situs* of its own for the purpose of taxation, and is, therefore, *as a general thing*, assessable for taxes at the place of its owner; but the contention of plaintiffs in error is that there are exceptions to this general rule which are as well established as the rule itself, and that this case falls within one of the exceptions, namely, where intangible property becomes *localized*, in the hands of an agent for instance, in a State different from that of the domicil of the owner, and is used in the State in a *permanent and continuous* business, the maxim, *mobilia sequunter personam,* upon which the general rule is based, ceases to apply, in so far as it affects the right of the latter State to impose taxes. Citing as supporting this contention *City of New Orleans* v. *Stemple*, 175 U. S. 309, 20 Sup. Ct. 110, 44 L. Ed. 175; *State Board of Assessors, &c.* v. *Comptoir National D'Escompte de Paris*, 191 U. S. 390, 24 Sup. Ct. 109, 48 L. Ed. 232.

The syllabus of the first-named case states the doctrine as follows: "Moneys collected as interest and principal of notes, mortgages and other securities kept within the State for use or re-investment, though the owner is domiciled in another State, and the moneys are deposited in bank to his credit, are subject to taxation under the acts of the State," etc.

"Notes and mortgages, the owner of which is domiciled in another State, where they are kept within the State by an agent, may be subjected to taxation by the laws of the State in which they are held."

In the second-named case, after citing a number of authorities, the opinion of the court says: "From these cases it may be taken as the settled law of this court that there is no inhibition in the Federal Consti-

tution against the right of the State to tax property in the shape of credits where the same are evidenced by notes or obligations held within the State, in the hands of an agent of the owner for the purpose of collection or renewal, with a view to new loans and carrying on such transactions as a permanent business.

"The maxim, *mobilia sequunter personam*, which was applied in the court below as forbidding taxation of the checks in the hands of the agent in New Orleans, has been frequently held to be but a fiction of law, having its origin in considerations of general convenience and public policy, and not to be applied to limit and control the right of the State to tax property within the jurisdiction. . . .

"Applying these principles to the facts in the case, we have no doubt that these checks, secured in the manner stated, and given for the purpose of evidencing an interest-bearing debt, were the evidence of credits for money loaned, localized in Louisiana, protected by its laws, and properly taxable there.

"The Comptoir was a foreign corporation; its business in Louisiana was in the hands of an agent; it furnished to the customer a sum of money and took from him a collateral security; for reasons satisfactory to the parties, instead of taking the ordinary evidence of indebtedness, the customer drew a check, never intended to be paid in the ordinary way, but intended by the parties to be held as evidence of the amount of money actually loaned; this loan could be satisfied by partial payments from time to time, interest being charged on the outstanding amounts, and if not paid at maturity the collateral was subject to sale; when paid, the money might be again loaned by the agent to other parties or remitted to the home office, and the business was continuing in its character.

"It is true the money to be paid to the customer was generally obtained by the Comptoir drawing its draft upon New York or upon its home office, and a large part of the business of the Comptoir was in selling foreign exchange, but we cannot perceive that the transaction between the parties was any the less a loan because of the source from which the money was obtained.

"We find nothing in the requirements of the Federal Constitution or the statues of the State of Louisiana, as construed by its Supreme Court, which should exempt such property from bearing its burden of taxation for the public benefit.    It follows that the circuit court erred in holding otherwise, and in granting a perpetual injunction."

The doctrine is stated in section 493, Beale on Foreign Corporations, thus: "Where a foreigner has an agent within the State, by whom investments are made, who collects the income and transmits it to his principal, it is usually held that the 'credits' have a *situs* in the hands of the agent within the State, and may be taxed there."

The doctrine is stated in 27 Am. & Eng. Ency. of L., p. 656 to be: "Money, securities, or other kinds of property placed in the hands of an agent for the purpose of enabling him to transact the owner's business, such property constituting the stock in trade of the business, are taxable at the residence of the agent. Such is, however, taxable only when intended to be used by the agent in a continuing business.

On page 927, the same authority says: "Personal property belonging to a corporation may in certain cases and under certain circumstances be taxed by the State other than in which the corporation is domiciled. It is well settled that where a corporation of one State

brings into another State a portion of its movable personal property to use and employ therein, it is legitimate for the latter State to tax such property like similar property used in like way by its own citizens," etc. And at p 928, it is said: "The general rule that bills, notes, etc., have their *situs* at the domicil of the creditor for purposes of taxation, is applicable to choses in action belonging to corporations as well as those belonging to individuals. A recognized exception of the rule that intangible property is taxable at the owner's domicile is when a corporation or person residing in one State has an agent in another, who conducts the business of his principal, and has notes in his hands for collection or renewal with a view of keeping up a permanent business; in such case the actual *situs* of the notes will be the place of taxation."

This doctrine is recognized as well established in *Adams Ex. Co.* v. *Ohio State Auditor*, 166 U. S. 185, 17 Sup. Ct. 604, 41 L. Ed. 965, and where the subject of the *situs* of the intangible property of a foreign corporation, and the right of another State to tax the same, are discussed and upheld, the court in concluding the discussion using the following language, which is very pertinent to the case at bar: "In conclusion, let us say that this is eminently a practical age; the courts must recognize things as they are and as possessing a value which is accorded them in the markets of the world, and that no fine-spun theories about *situs* should interfere to enable these large corporations, whose business is carried on through many States to escape from bearing in each State such burden of taxation as a fair distribution of the actual value of their property among those States requires."

Its charter authorizes defendant in error "to lend money to such parties and on such terms as may seem

expedient, on security of any description of property, or upon personal security;" and lending money is not an inconsiderable part of the company's business from its Virginia office, as appears from the facts proven in this case.    The amounts loaned as of February 1st for six successive years were as follows: 1908, $239,037.63; 1909, $212,100.00;   1910, $433,350.00;   1911, $672,-600.00;   1912, $666,048.88, and  1913, $651,134.00. On none of these credits or the securities therefor does the company pay a tax in Great Britain or elsewhere, and as we have seen the company has, since January 1, 1911, been relieved of the payment of all taxes to the British   government,   except   in   respect   to  income derived from machines sold for use in the United Kingdom, and prior to that time it paid only a tax on its income—none on its capital or other assets.    The company's statutory office in this State, as we have already observed,  is  at  Durmid,  Campbell county, Virginia, where it maintains and operates a large plant for manufacturing  cigarette  machines,  at  immense  profit,  and where its tangible property must be assessed for taxation,  if  it  can  be  so  assessed  under  the  laws  of  this State.

The argument of the questions arising, or suggested, on the assignment of error we are considering has taken a wide range, and it would be impossible for us in this opinion to follow it to all of its length—indeed, this is unnecessary, for after all the assignment must stand or fall upon one of two propositions contended for by plaintiffs in error, which are, *first*, that defendant in error has been domesticated in Virginia for purposes of taxation, and has acquired a commercial domicil here; and, *second*, if this company has not been domiciled in Virginia for purposes of taxation, still it, and every other foreign corporation that establishes in

Virginia a place of manufacture, is required, under the tax laws of Virginia, to pay a tax upon its capital employed here. In other words, while the law is well settled, as shown by the authorities cited above, to which many more could be added, that this State has the right and power to impose taxes upon the capital of a foreign corporation employed in a manufacturing business which the corporation has established and is conducting within this State, do our tax laws impose the taxes and levies which have been assessed and levied against defendant in error and which are the subject of this litigation?

As stated above, arrangements had been made by the company whereby the entire management and conduct of its business were, on April 25, 1911, being directed from the company's offices at Durmid, Campbell county, Virginia, and the company relieved of the payment of all taxes to the British government except in respect of incomes derived from machines sold for use in the United Kingdom, and it is urged on behalf of plaintiffs in error that this corporation should at least be held to have acquired a commercial domicil in this State and to be subject to the tax laws of the State as to the business done here from that date. Citing Beale on Foreign Corp., sec. 71, where a number of decided cases are cited. And it is further contended that since a foreign corporation may acquire a commercial domicil in a State where it is not chartered, section 1103-b, Va. Code, as amended by an act approved February 14, 1912, Acts 1912, p. 54, prescribes for defendant in error a commercial domicil for purposes of taxation in this State.

This act was first passed as Ch. 43 of the Acts of 1889-90, p. 33, and has been twice amended, but these amendments need not be specially mentioned as they

are not material to the issue here.   The title of the act as last amended—1912, *supra*—reads as follows: "An act to enable certain mining and manufacturing corporations to conduct operations in this State;" and the act provides that corporations chartered or organized under the laws of other States or countries, and authorized to manufacture iron, steel or other metals, or any articles or material made from metal, wood, cotton or wool, or to mine ores or coals, may carry on in this State the business authorized by their respective charters or by the articles under which they are or may be organized, and for this purpose may purchase, acquire, lease, mortgage and convey real estate in fee, and any other lands or personal property of every kind suitable for their business.   In addition it is provided that every such corporation desiring to carry on its business in this State shall first comply with the provisions of section 1104 of the Code, and as to its *contracts made, property located*, and the franchises hereunder exercised within this State, every such corporation shall *for all purposes* be deemed and treated as a corporation of this State and be subject to the jurisdiction of the courts thereof" (italics ours); and the act concludes: "All taxes, dues and demands that may become due to the State of Virginia shall be paid in lawful money of the United States and not in coupons."

The testimony given by Gerow, chairman of defendant in error's board of directors, is that the materials of which the machines manufactured by the company consist are iron, steel, brass, aluminum, wood, linen, and in some instances velvet or plush and leather, and that the principal component parts are metal—thus bringing the machines manufactured by this company, as it would seem, clearly within the provisions of section 1103-b, *supra*.

It has to be borne in mind, when the statue in question comes to be construed, that it would have been entirely competent for the Commonwealth of Virginia to have denied foreign corporations authority to engage in mining or manufacturing in this State. (*Waters-Pierce Oil Co.* v. *Texas*, 177 U. S. 28, 20 Sup. Ct. 518, 44 L. Ed. 657; 19 Cyc. 1251.) The State having the power to exclude a foreign corporation from so acting unless it fulfills certain prescribed conditions. *Paul* v. *Virginia*, 8 Wall. 181, 19 L. Ed. 357.

We have cited above ample authorities to sustain the proposition that where a foreign corporation has an agent within a State by whom investments are made, who collects and transmits them to his principal, the "credits" have a *situs* within the State and the State has a right and the power to tax them.

The authorities cited by counsel for defendant in error show, we think, that while a statute may not make a foreign corporation a "citizen" within the meaning of the Federal Constitution, the same statute may domesticate a foreign corporation for purposes of taxation; and it is well established that "instead of merely licensing a foreign corporation to operate a railroad, or to transact any other business within its borders, a State may, for reasons of its own, adopt the foreign corporation by creating it a domestic corporation, with the same franchises and powers that it exercises in the State which originally created it, or with powers that are less or more extensive." *Missouri Pac. Ry.* v. *Michigan*, 69 Fed. 753, 16 C. C. A. 510, 30 L. R. A. 250; Beale on Foreign Corp., sec. 773. Whether the second State has chosen to do this in any particular case is a matter of interpretation. *Memphis, &c. R. Co.* v. *Alabama*, 107 U. S. 581, 2 Sup. Ct. 432,

27 L. Ed. 518; *Goodlett* v. *L. & N. R. Co.*, 122 U. S. 391, 7 Sup. Ct. 1254, 30 L. Ed. 1230.

"If the enabling act provides that the foreign corporation shall be a corporation of the enabling State, and shall possess as large powers as are possessed by certain corporations of the State, the act is one of incorporation and the foreign corporation becomes a domestic one." Beale on Foreign Corp., *supra*, citing *Indianapolis & St. L. R. Co.* v. *Vance*, 96 U. S. 450, 24 L. Ed. 752, in which case is an instructive discussion of the subject in the court's opinion by Mr. Justice Harlan, and in which it is held that for purposes of taxation an act of the Illinois legislature, providing that a foreign corporation should be a corporation of the State of Illinois made that corporation subject to the taxation laws of the State. See also *Railroad Co.* v. *Harris*, 12 Wall. 82, 20 L. Ed. 358, where the court said: "Nor do we see any reason why one State may not make a corporation of another State, as there organized and conducted, a corporation of its own *quoad hoc* any property within its territorial jurisdiction. That this may be done was distinctly held in *O. & M. R. Co.* v. *Wheeler*," 1 Black 297, 17 L. Ed. 133.

The contention of defendant in error that the statute, section 1103-b, *supra*, construed as contended for by plaintiffs in error, is unconstitutional (1) because it attempts to domesticate foreign corporations by legislative enactment, and (2) because the act is too broad for its title, is without merit. The title of the act is, "An act to enable certain mining and manufacturing corporations of other States or countries to conduct operations in this State;" and the act shows that it is conferring powers and privileges upon certain mining and manufacturing corporations, and the provision of the act, with which we are dealing in this case, pre-

scribes the conditions upon which these powers and privileges may be exercised. That the provisions of the act are congruous with and germane to its title, there being a natural connection between the two, has been held by numerous decisions of this court, among them *Whitlock* v. *Hawkins,* 105 Va. 242, 53 S. E. 401; *Couk* v. *Skeen,* 109 Va. 6, 63 S. E. 11; *Com'th* v. *Willcox,* 111 Va. 849, 69 S. E. 1027. The provision of the act is that as to contracts made within this State and property located therein, corporations of the class to which defendant in error belongs, shall, for *all purposes,* be deemed and treated as a corporation of this State, which is clearly a logical and reasonable condition to prescribe for manufacturing as well as mining corporations. The act does not "impose a tax," as is contended, and, therefore, does not violate section 50 of the Constitution of the State requiring that a law imposing a tax shall specifically state such a tax; but it is a necessary and a salutary inference, we may say, from the statute, that since as to contracts made and properly located within the State, these mining and manufacturing corporations are *for all purposes* to be deemed and treated as corporations of this State, they are also to be deemed and treated as subject to the tax laws of this State, and since mining and manufacturing corporations of the State are required to pay on their intangible property, then mining and manufacturing companies embraced within section 1103-b should also be required to pay a tax on their intangible property arising from or used in their business done in this State.

Nor does the statute contravene the Constitution in that it attempts to domesticate foreign corporations by legislative enactment. As observed, the State has the right and power to exclude a foreign corporation from acting through its agent within its territory, unless

such corporation complies with certain conditions, and whatever may be the functions of our Corporation Commission under the Constitution of 1902, it is to be also observed that this statute was enacted in 1889 and has been twice amended and re-enacted, once before and once since the Constitution of 1902 went into effect; so that the legislature has taken the position that the act was not repealed by the provisions of the Constitution and has seen fit to extend it by amendments which do not in any way conflict with the powers conferred upon the Corporation Commission by the Constitution. It was not necessary for plaintiffs in error to establish in this proceeding that for all purposes defendant in error has been domesticated, but simply that, so far as its contracts made in this State and its property located therein are concerned, the statute requires that this and like corporations shall be deemed and treated as a corporation of this State, and this statutory direction requires the corporation to be taxed as a domestic corporation to the extent that it holds property and conducts a business in this State.

We are of opinion that the trial court erred in its ruling relieving and exonerating defendant in error from any and all taxes and levies on all of its intangible property in question, and in failing and refusing to assess against defendant in error any proper taxes on its intangible property, or on capital used in the conduct of the company's business in this State, the *situs* of which is here; but this conclusion is upon the hypothesis that our tax laws authorize and require that defendant in error be so taxed, which brings us to a consideration of our statutes relied on as imposing upon defendant in error the taxation which is here in question.

In considering this question it must be borne in mind that our State Constitution provides that "all property, except as hereinafter provided (the exceptions having no application here), shall be taxed, and all taxes . . . shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Const., sec. 168. We must also, in determining the question under consideration, read our tax bill as a whole, together with those provisions of the Code which have reference to the returns of property for taxation.

An analysis of our tax laws shows that taxable subjects may be classified as follows: First, lands, lots and improvements thereon, ground rents and rent charges; second, persons and personal property, which second subject is sub-divided as follows: Schedule A, embracing male inhabitants twenty-one years of age; Schedule B, embracing tangible personal property, and Schedule C, embracing intangible personal property. This case calls for a correct construction of Schedule C, sec. 8, of the tax bill, as amended Acts 1908, ch. 213, p. 322. (Pollard's Supplement, 1910, p. 509.) Under Schedule C, as amended, there are seven classifications of intangible property. The first sub-division, to-wit, "bonds, notes and other evidences of debt," etc., is the general head addressed to individuals and corporations not engaged in such a business that the tax is required to be on the capital of the business; but persons or corporations engaged in a manufacturing business are not usually taxed under this class. The second sub-division, namely, "all capital of individuals including moneys, credits, or other thing loaned, used or employed out of this State," applies to an individual who is engaged in business in this State and who

may also carry on a business out of this State. The third sub-division is: "Capital" of incorporated joint stock companies not otherwise taxed; and when all "of such capital is taxed by the State of Virginia, the shares of stock in the hands of individual shareholders shall not be further taxed for State purposes; but real estate belonging to such companies shall not be held to be capital, but shall be listed and taxed as property, and not as capital." This section clearly applies to corporations, whether foreign or domestic, which are engaged in such a business in the State of Virginia that the State would tax its capital, except that it does not apply to a corporation in the mercantile business, for the reason that a corporation, whether domestic or foreign, engaged in Virginia in a mercantile business, pays a license tax based upon its purchases; but if a corporation be engaged in Virginia in a manufacturing business, then such a corporation is not otherwise taxed, and this section is applicable to such a corporation. Sub-division fourth relates to "capital of individuals invested, used or employed in any trade or business not otherwise taxed," and clearly would embrace both residents and non-residents who engage in this State in a business of such a nature that a tax on the capital used in the business—that is to say, if an individual, either resident or non-resident, and corporations, domestic or foreign, doing in this State business as manufacturers or other business, where a license is not in lieu of tax on capital, and it is to be observed that in the second, third and fourth subsections of section 8, Schedule C, the word "capital" is used, and the fourth sub-section gives its definition as follows: "Moneys and credits actively used and employed in carrying on the trade or business, materials, goods, wares and merchandise on hand and all solvent

bonds, notes, demands or claims made or contracted in the course of such business during the preceding year, shall be held to be capital in such business, and shall not be taxed otherwise than as such capital.  .  .  " This statutory definition of "capital" has been held by this court in *Bridgewater Mfg. Co.* v. *Funkhouser,* 115 Va. 476, 79 S. E. 1074, to be applicable to the other sub-sections wherein the word "capital" is used; and this definition has been extended to the whole tax laws by amendment of section 489 of the Code—Acts 1915, ch. 147, pp. 219, 224.

The first sub-division of section 8, Schedule C of the tax bill does require the commissioner of the revenue to obtain from each person, natural or artificial, *residing* in his district, city or town, a list in detail of the date, amount, etc., "of all bonds, notes and other evidences of debt due and payable to such person in excess of one hundred dollars;" but manifestly the use of the word *residing* in that sub-section of section 8, Schedule C, of the tax bill was never intended to have a controlling influence in the construction of the other provisions of the tax laws and does not.

The contention of the defendant in error is that no foreign corporation, engaged in the manufacturing business in Virginia, is required to pay a tax upon its capital, and the court below adopted that view, as we have seen, basing its opinion upon the provision in the sub-section 8 of the tax bill, mentioned above, as to the requirements for making returns to the commissioner; but this erroneously leaves out of view not only the general scheme of the tax bill, but also section 494 of the Code, which, so far as applicable here, reads as follows: "The commissioner, or his duly qualified deputies, shall on personal application to each person, firm and corporation *residing, doing business, or having an*

*office* in his district, obtain answers to interrogatories addressed to such firm or corporation not otherwise taxed on its property, in order to ascertain from them all personal estate, money, contracts and credits which are owned by such person, firm or corporation and are subject to assessment for taxation under this chapter. . . . And it shall be the duty of such person, firm, or corporation to give a true and perfect answer to each and every interrogatory addressed to him by the commissioner or his deputies." (Italics ours.)

This statute very plainly contemplates not only that persons residing in the commissioner's district shall be subject to interrogatories, but that persons, firms and corporations that *reside or do business* in the district, or *have an office* in the district must answer the interrogatories; and taken in connection with Schedule C of the tax bill, *supra*, this statute—sec. 494, *supra*—also contemplates what is a fact of common knowledge, that some persons and corporations may reside in Virginia and not do business here, and that some persons and corporations may do business in Virginia and not reside here. In other words, the law is clear that where a person resides in Virginia (that is, has a legal domicil here) he is required to pay a tax on all of his intangible personal property, both in and out of Virginia; but where a person has his domicil elsewhere, and does not do business in Virginia, he pays a tax only on his tangible personal property and real property in Virginia. On the other hand, where a person has his domicil elsewhere, but engages in Virginia in a business subject under the laws of the State to a tax on the capital employed in such business, he is required to pay a tax upon his capital just as certainly as a citizen of this State is required to pay tax upon his capital. Likewise, where a Virginia corporation engages in business in Virginia,

the State requires such a corporation to pay a tax upon its capital employed in such business, unless there is a provision of the tax law exonerating its capital and otherwise taxing the business; and where a non-resident corporation does business in Virginia, section 494 of the Code, *supra*, together with Schedule C of the tax law clearly indicates that the question of the residence or domicil of the corporation has nothing to do with the taxation of its capital engaged in business in this State, and such corporation is required to pay a tax upon its capital employed in such business, unless there be a provision of the tax law exonerating its capital and otherwise taxing the business, which is not the case here.

In the brief of counsel for defendant in error several cases are referred to which they claim establish the proposition, that since this corporation does not reside in Virginia, therefore it should not be taxed on its capital. The cases referred to are *Bank* v. *Richmond*, 79 Va. 116; *Com'th* v. *Williams*, 102 Va. 778, 47 S. E. 867; *Com'th* v. *C. & O. Ry. Co.*, 27 Gratt. (68 Va.) 344; *Loyd* v. *Lynchburg*, 113 Va. 627, 75 S. E. 233; *Pendleton* v. *Com'th*, 110 Va. 230, 65 S. E. 536. With respect to these cases we deem it only necessary to say that in none of them was the specific question now being considered presented to the court for decision, and, therefore, they do not affect the contention made in this case by plaintiffs in error, that the proper construction put upon our tax laws and the practical construction put upon them by the fiscal officers of the Commonwealth is that non-residents, whether persons or corporations, engaged in business in the State of Virginia, are required to pay a tax upon their capital, employed in such business, unless such business is otherwise taxed. Indeed, it appears that defendant in error itself has recognized that the State had a right to tax its capital

employed in this State, as intangible personal property, since the record in this case shows that it, beginning with the year 1908, made a return and was assessed under the third sub-section of Schedule C of the tax bill, to-wit: "On capital of incorporated joint stock companies not otherwise taxed," $10,000 per year from 1908 to 1912, inclusive.   This corporation being engaged in this State in a business "not otherwise taxed" it seems to us as inevitable that its capital employed in such business has to be taxed.   If this were not true the result would be that foreign corporations and non-residents of Virginia, who engage in a business in this State, receive a benefit and an advantage not given by the laws of the State to Virginia corporations and residents of this State.   No good reason can be assigned, as it seems to us, for allowing a non-resident, either person or corporation, to come to this State and establish here a business and not require such person or corporation to pay a tax upon the capital employed in such business, when this is specifically the tax which the laws require of the resident corporation or person engaged here in the same business.   A construction which would allow a non-resident corporation or person such a privilege as this would surely have the effect of turning the business of this State over to non-residents and would prove destructive of the business of the State's own citizens, and every corporation now holding a Virginia charter would have good reason to surrender the same and take out its charter papers from another State, in order to evade the payment of taxes required by the State of Virginia of resident corporations or persons engaged in business here.   While our laws have always favored manufacturers, they were never intended to, and do not, go so far in that policy as to favor the non-resident who establishes a

place of manufacture in Virginia, to the detriment of the resident who has a place of manufacture here.

This brings us to the next question presented. Upon examining the disclosures made by the defendant in error in response to demands from counsel for the Commonwealth, the trial court found that the company had on hand property valued on its books as follows: "Value of materials, cirgarette machines and parts of same on hand as of February 1st," 1908, $29,510.29; 1909, $32,944.10; 1910, $44,211.55; 1911, $44,240.76; 1912, $39,466.17; 1913, $45,440.24; whereupon the court took the view, not only that defendant in error was not assessable at all on its intangible property, but that the property just mentioned should have been returned and assessed as tangible property, and ordered an assessment thereon for each of said years, after deducting from the amount of each year the sum of $10,000, intangible personal property, which the court held was erroneously assessed against the company.

This ruling we think was erroneous. The items of property mentioned should rightly have been assessed as *capital* under the definition of Schedule C of the tax bill, to-wit, "moneys and credits actively used and employed in carrying on a trade or business, materials, goods, wares and merchandise on hand, and all solvent bonds, demands, or claims made or contracted in the course of business during the preceding year shall be held to be capital in such trade or business, and shall not be taxed otherwise than as such capital . ." It may be that these items of property might *apparently* be classified under the head of tangible personal property, but upon examining Schedule B and Schedule C of the tax bill we reach the conclusion that they should not be so classified in the case of a manufacturer, unless they are on hand *permanently for use in its busi-*

*ness* and *not for manufacture or sale* after manufacture; and if such manufacturer, whether a person or a corporation. engaged in such business, makes a correct return of all the capital employed in the business, it should not be required to make a return also of the property on hand for the purpose of manufacture or sale, for this would be a double assessment.

"Ordinarily and in common parlance, the word 'capital,' when used in reference to commerce or trade, including manufacturing, signifies the money and other property adventured in the business." *Bridgewater Mfg. Co.* v. *Funkheuser, supra,* and authorities cited.

It appears in the record of this case that defendant in error had open accounts on the books of its Lynchburg and Durmid offices as of February 1 of each of the years from 1908 to 1913, inclusive, amounting to thousands of dollars, and also held on February 1 of each of said years notes and bonds of the aggregate face value as follows: 1908, $239,037.63; 1909, $212,-100.00; 1910, $433,350.00; 1911, $672,650.00; 1912, $666,048.88 and 1913, $651,134.34. On none of these credits, as we have seen, did the company pay a tax anywhere. For the reasons already given, and under the definition of *capital* stated, these open accounts should have been assessed for taxation, classified as solvent demands or claims made and contracted in the course of business during the preceding year, and, therefore, should have been held by the court below to be capital employed by defendant in error in its business at Durmid, Va.; and said notes and bonds should also have been held to be moneys and credits actively used and employed in carrying on the business, or as solvent bonds, demands or claims made or contracted in the course of the business of the company

during the preceding year, and, therefore, to be classified as capital.

The remaining assignment of error presents the question whether or not there should have been charged the five *per cent.* penalty prescribed by law on the taxes assessed by the court on defendant in error's omitted tangible property for the years 1908 to 1912, inclusive, and also for the year 1913.

Section 603 of the Code, as amended by act approved February 20, 1906—Acts 1906, p. 31—provides that, "Any person failing to pay any State taxes or county and city taxes to the treasurer by the first day of December shall incur a penalty thereon of five *per centum*, which shall be added to the amount of taxes or levies due from such tax-payer," etc.

Under the law two obligations rest on the tax-payer, one is to see that his property is properly assessed, and the other is to pay the tax thereon by December 1 following, if he would escape the penalty. If a tax-payer who makes a full and correct return of his property to the commissioner of the revenue and fails to pay the tax in time cannot escape the penalty, then *a fortiori* a person or corporation subject to taxation who refuses or fails to make a return should be subject to the same penalty as one who made a return but failed to pay the taxes.

The defendant in error assigns cross-errors to the rulings of the trial court, which are argued under three heads: "First, the right of the lower court to reassess the defendant in error's tangible personal property for the years 1908 to 1913, both inclusive; second, its right to adopt as a basis of so doing the company's book valuations of the property assessed; and, third, its right to charge interest on the taxes and levies based on said assessments."

Having taken the view that the value of the materials, cigarette machines and parts of same which it was found that defendant in error had on hand as of February 1 each of the years mentioned should not have been assessed as tangible property, but as *capital,* under the definition given in Schedule C of the tax bill, it is unnecessary to consider the cross-errors discussed by counsel for defendant in error under the first two headings mentioned.

Under the third heading of the cross-errors is called in question the right of the court to charge interest on taxes and levies based on reassessments of the property of defendant in error which had been improperly assessed, or not assessed at all.

"A taxpayer who comes into court under the provisions of the statute of this State, to be relieved from paying more taxes than he claims he ought to pay renders himself liable in that proceeding to pay all taxes with which he is chargeable in that jurisdiction upon a correct assessment of his property, and to this end the court may examine into and do all that the commissioner of the revenue is required to do under the provisions of sections 508 and 509 of the Code." *Commonwealth* v. *Schmelz,* 114 Va. 364, 76 S. E. 905; S. C., 116 Va. 62, 81 S. E. 45.

Section 508 of the Code provides: "If the commissioner ascertain that any person, or any real or personal property, or income, or salary, has not been assessed for taxation for any year, or that the same has been assessed at less than the law required for any year, or that the taxes thereon for any cause have not been realized, it shall be the duty of the commissioner to list the same, and assess the taxes thereon at the rate prescribed for that year, adding thereto interest at the rate of six *per centum per annum.* Where the same

was omitted by no fault of the person charged with the taxes, no interest shall be charged."

Section 509 provides merely that the commissioner shall extend in his land book and book of personal property the county and city levies, including the school and road tax, etc.

When, therefore, it is ascertained in this proceeding that there has been omitted from assessment for taxation for State, county and district purposes property of the defendant in error which should have been assessed for taxation for the years 1908 to 1913, both inclusive, clearly under the sections of the Code just cited such taxes or levies as may be ascertained to be due and owing from the defendant in error on such property should bear interest at the rate of six *per centum per annum* from the time at which such taxes or levies became due and owing, unless it shall appear from the evidence adduced at the next hearing that the property was omitted from assessment for taxation through no fault of the defendant in error.

Upon the whole case, we are of opinion that the judgment of the circuit court, because of the errors assigned by plaintiffs in error, has to be reversed and annulled, and the cause will be remanded for further proceedings therein in accordance with the views expressed in this opinion.

*Reversed.*