Statement.

## Richmond.

### JAMISON V. COMMONWEALTH.

November 16, 1916.

1. TAXATION—*Non-Residents—Intangibles—Loans Made Outside of State—Establishment of Business—Acts 1915, p. 163.*—A non-resident who has neither domicile, place of business nor an agent in this State, but who, upon applications to him outside of this State, lends money secured by liens on real estate in this state, and keeps the evidences of debts at his place of residence outside of this State and there receives and collects the principal and interest of such debts, is not conducting a business in this state within the meaning of Acts 1915, p. 163, although he may from time to time come to this state to inspect the lands upon which loans are to be secured, and the bonds, notes, and other evidences of such loans are not taxable in this State under said act. He has not established a business in this State, and has neither a business, domicile nor agent here, and the evidences of debt are not kept here.

2. TAXATION—*How Tax Laws Construed.*—Laws imposing taxes are strictly construed, and whenever there is a doubt as to the meaning or scope of such laws they are construed most strongly against the government and in favor of the citizen.

Error to a judgment of the Circuit Court of Page county, on a motion to correct an erroneous assessment of taxes. Judgment for the defendant. Petitioner assigns error.

*Reversed.*.

The opinion states the case.

*R. S. Parks, Leedy & Berry* and *D. O. Dechert,* for the plaintiff in error.

*Jno. Garland Pollard, Attorney-General,* and *Leslie C Garnett, Assistant Attorney-General,* for the Commonwealth.

18

CARDWELL, P., delivered the opinion of the court.

This is an application of plaintiff in error, J. V. Jamison, to the Circuit Court of Page county, made under the statute, to be relieved from the payment of taxes and levies assessed against him on intangible personal property consisting of bonds and notes evidencing loans in the aggregate amount of $36,650, to sundry persons, residents of Page county, and secured by deeds of trust on lands situate in said county.

The application was defended and contested by the Commonwealth, and at the hearing of the cause upon the evidence adduced for and against the relief asked, the court refused to correct the assessment as erroneous and dismissed the application; whereupon Jamison applied for and was allowed this writ of error.

Assessment of the bonds and notes in question was made by the examiner of records for the judicial circuit embracing Page county from the records of the clerk's office of the county, and certified to the commissioner of the revenue for taxation against Jamison, as the owner of the bonds and notes as of February 1, 1915, the assessment being made by virtue of section 9 of the act of March 17, 1915, Acts 1915, p. 163, which, so far as applicable, is as follows:

"The provisions of this section of this schedule shall apply with equal force to any person or corporation representing in this State business interests that may claim a domicile elsewhere, the intent and purpose being that no non-resident person or corporation either personally or through an agent shall transact business here without paying to the State a corresponding tax with that exacted of its own citizens, and all bills receivable, obligations or credits and other intangible assets arising from the business done in this State are hereby declared assessable

within this State and at the business domicile of said non-resident person or corporation, his or its agent or representative."

The schedule referred to in this provision of the statute is schedule "C" of the general tax law ,as amended, and which classifies intangible property—bonds, notes, etc.—intended to be subjected to taxation in this State.

The trial court certifies the evidence in the case, which shows the manner in which the bonds and notes in question were acquired by Jamison and the manner in which he deals with them, and the court's certificate then adds: "The court further certifies that it was clearly proven as a fact at the hearing of said application, and indeed admitted by the applicant, Jamison, that said applicant was regularly engaged in lending money in Page county, as a business conducted for profit, and that the bonds assessed to him by the examiner of records, constituting the assessment here in question, were given for and evidenced loans made by him in the course of such business."

Jamison, as is conceded, was at the hearing of the cause and had been for eighteen years prior, a resident of Hagerstown, in the State of Maryland, but previous to that period of time had been a resident of Luray, Page county, Va. The testimony given by him on his own behalf before the trial court, so far as material to the issue in the cause, is as follows:

"I am the same J. V. Jamison against whom the examiner of records for Page county returned $36,650 worth of bonds, belonging to me, for assessment for the year 1915. All of said bonds are secured by deeds of trust on lands situated in Page county, Va. I have loaned a great deal of money in Page county, and have some cash now that I would be glad to place here should I have a desirable application. I do not have an agency nor an agent in Page county to make loans for me, nor for any other

purpose. The truth is I am so well acquainted with the lands for ten miles around Luray that I would generally know on application whether the loan would be a desirable one or not; and in such cases as appeared doubtful to me I have come to the county to look the property over myself. Mr. Landram (an attorney) frequently made application to me for parties, and others have done the same thing, for loans. Mr. Keyser (referring to the Commonwealth's attorney present) has for one * * * A great many applications were made direct to me by the parties desiring the money. And some of these loans were desirable and I took them, without consulting anybody, as I knew the applicants personally and the property offered by them as security. If I had doubt about the title I would have Mr. Landram to examine the title for me; but he never was my agent and I never paid him a dollar as compensation, nor did he ever collect any money for me, either principal or interest, both of which were always paid direct to me by the parties owing it or through the Page Valley National Bank of Luray. The deeds of trust securing these bonds, the bonds themselves, and the insurance policies were always sent to me at the time the loan was made; they would be sent to me and I would send my check for the amount of the loan. I kept them in my deposit vault in Hagerstown and have never had any bonds or notes or moneys deposited with any person or institution in Virginia since I moved from the State. The laws of Maryland require me to render these bonds for assessment; they were so rendered, and I pay a tax on them in the State of Maryland. It is true that Mr. Charles S. Landram appears as trustee in practically every trust wherein I am secured the payment of money in this county. This is true because he has made more applications to me for money for different persons than anyone else. He was getting the money, negotiating the loans for these respec-

tive persons, and preparing the papers, and would, of course, make himself trustee in the deeds of trust. I was treating him just as I would any other broker. Just like I would go to Baltimore and buy a bond from Baker, Watts & Co., brokers. Mr. Landram would have an application for a loan. He would write me, say, that he had a $5,000 bond of which so and so was the maker, secured on certain property, and ask me whether I wanted the bond. I would know the party upon the mere mention of his name, because I have known practically everybody in Page county, and am familiar with the properties in Page county. If it looked good to me I would take the bond, otherwise I would not. Mr. Landram is no more my agent than Col. Leedy, or Mr. Berry, or Mr. Keyser, the Commonwealth's attorney there, or any other person. * * * I never had any one in Virginia, or elsewhere, authorized to make loans or investments for me. It has always been my rule to see to these matters for myself. As I have stated, I always collect both the principal and interest myself, or have it paid to me through the Page Valley National Bank, of Luray, and the bank immediately remits to me. I never left any money in Virginia, with anybody or any institution, for reinvestment, either principal or interest."

Upon being shown certain deed books in which two deeds of trust appeared to be marked satisfied on the margin by "C. S. Landram, agent for J. V. Jamison,' the attorney for the Commonwealth asked the witness, Jamison, to explain the use of the term "agent" as it there appeared, and in answer to which Jamison said: "I do not know by what authority Mr. Landram used the term agent, but the fact is that upon receiving payment of several bonds I remember, after having cancelled them, I have sent them to Mr. Landram with a letter requesting him to take them to the clerk's office and enter satisfaction on the margin

of the records for me. This may have occurred frequently and you may find more instances of it. But in most cases the releases have been made by the Page Valley National Bank, to whom I would send the bonds for collection and remittance."

C. S. Landram, to whom Jamison referred in his testimony, was examined as a witness for the latter, and the substance of his testimony is that he was not the agent for Jamison and had never been; that he (witness) dealt in and sold a great many mortgage loans, many of which he sold to Jamison; that when he had an application for a loan that he thought would be acceptable to Jamison, he would write and give him the name of the applicant, the terms of the loan and the property offered as security; that sometimes these applications were accepted by Jamison and he would advise witness that he would purchase or take the loan described, in which case the deed of trust would be prepared by witness in Jamison's name and all papers forwarded to him, upon receipt of which Jamison would send witness his check to cover the loan; that in some cases Jamison would not advise witness definitely whether he would purchase the loan until he (Jamison) could come to Page county for the purpose of inspecting the property offered as security * * *; that Jamison had often refused to purcahse loans offered him by witness and that he (witness) was the trustee in all loans that he negotiated and that he had negotiated a large number of real estate loans, with quite a number of different purchasers and did not remember ever having collected either any principal or interest for Jamison except in one or two cases in which he increased or renewed old loans, in which case Jamison assigned the bonds to witness and they were merged in the new loan, after which they were released on the margin of the deed

book by witness and in such cases witness designated himself either the assignee or agent of Jamison.

With respect to the marginal releases which were made by witness in the deed books shown to Jamison, he stated that in these cases the notes were paid direct to Jamison by the borrower and that Jamison sent witness the cancelled notes, requesting that he make the release for him. Witness further stated that in these cases he designated himself the agent of Jamison for the purposes of these releases, thereby conforming to the language of the statute authorizing marginal releases and further, "I have never retained in my hands, for any purposes, any notes or bonds or other papers connected with Mr. Jamison's loans, nor have I ever had in my hands any moneys belonging to Mr. Jamison to be used in making loans or for any other purpose. "I often have aplications for loans and agree to make them, when at the time I do not know with whom I will negotiate the loan; but they are subsequently sold by me to any one who is willing to buy them."

G. T. Chapman, a resident and merchant of Luray, Va., testified: "I am the G. T. Chapman who was the maker of the deed of trust recorded in the deed book shown Mr. Jamison, and which was released on the margin by Chas. S. Landram, agent for J. V. Jamison. I paid this bond by a remittance direct to Mr. Jamison in Hagerstown. He sent me the cancelled bonds, and subsequently wrote Mr. Landram requesting him to go to the clerk's office and make the marginal release there. I remitted my interest on this loan direct to Mr. Jamison in Hagerstown by my personal check. The last bond covered by this trust, but not the one released by Mr. Landram, I paid through the Page Valley National Bank, and the bank made the release on the margin of the record."

The Commonwealth introduced no testimony to controvert that given by Jamison and his witnesses, Landram and

Chapman, the only testimony from the Commonwealth being that given by the examiner of records, his deputy and the commissioner of the revenue for Page county, as to how this assessment here in question was made up—that is, from the records in the clerk's office of Page county.

As we read the evidence quoted above, and which the circuit court certifies as being all the evidence adduced in the case by either party, it proves (1) that the bonds or notes in question, assessed for taxation against Jamison in the county of Page, Virginia, were not in the State; (2) that Jamison had no agent in this State for any purpose—not even for the purpose of collecting the bonds or notes when due and remitting the proceeds; and (3) that these bonds or notes, since they were purchased or taken up as loans by Jamison, have been at all times in his possession at his place of residence in the State of Maryland, where they have been regularly "rendered"—that is, listed and returned—for taxation, and the tax thereon paid.

It is conceded on the part of the Commonwealth that this State has no jurisdiction over the person of Jamison, a resident of Maryland, and that "the case resolves itself into whether or not the bonds or notes, evidences of credit in the hands of a non-resident, arising from the non-resident's regularly engaging in the business of lending money in Virginia, had a *situs* for taxation in this State where the business from which they arise is conducted, with or without the intervention of an agent." In other words, that "we are not dealing with a single credit or a series of separate credits, but with a business."

We do not gather from the evidence in the case that Jamison was regularly engaged in lending money in Page county, Virginia, "as a business conducted for a profit" within the meaning and intent of the provisions of the statute, *supra*. Certainly it cannot be arbitrarily said

that because Jamison had made many loans in Page county, and had more money that he would like to invest in that county in bonds or notes secured by trust deed, the evidences of the loans which are the subject of this controversy are assessable for taxation in Page county by reason of the debtors having their residence in the county, or because the land which is security for the bonds or notes is situated in Page county, since the statute instead of so providing, expressly stipulates that such bonds or notes are assessable, if at all, at the business domicile of such non-resident in this State. It seems clear to us from the reading of the statute as a whole that, so far as applicable to this case, its meaning is that where a non-resident, person or corporation, comes into Virginia and establishes a place of business to buy bonds or notes, and thus loan money and thereby have obligations due him arising from that business, he is to be taxed upon such obligations, just as a citizen of Virginia engaged in a like business is taxed; the tax thereon to be assessed at the business domicile of such non-resident person or corporation, his or its agent or representative. The act itself declares its intent to be that "no non-resident person or corporation, either personally or through any agent, shall transact business here without paying to the State a corresponding tax with that exacted of its own citizens," etc. We take it for granted that it would not be contended that, if a non-resident were to come into a broker's office or elsewhere in this State and invest his money in a chose in action of any character as a loan, and do this repeatedly, he was engaged in business in the city or county where he made the investment or investments, within the meaning of the statute here under consideration. The evidence in this case shows no more than that Jamison acquired the bonds or notes in question in a precisely analogous manner; he simply purchased these bonds or notes of residents of Virginia, se-

cured on lands in Virginia, and maintained no business domicile in Virginia, conducted either by himself or an agent.

The learned Attorney General cites a number of cases decided in the Supreme Court of the United States as supporting the contention that the test of the right of the State to tax these evidences of credit is not the presence in the State of the evidences of credit, not the jurisdiction over the person of the owner, nor the intervention of an agent, but the localization of the business from which they arise. An examination of these cases shows that the power of the State of origin of the credits to assess the same for taxation was upheld because *transactions in connection therewith were conducted within the State by agents of the creditor on the latter's behalf.* So, in the recent case decided by this court of the *Commonwealth* v. *United Cigarette Machine Co.,* 119 Va., 447, 89 S. E. 935, the power of the State to impose and collect the tax there in question upon the intangible property of the foreign corporation, consisting of "notes and bonds," accounts and money, was upheld upon the ground that the evidences of these credits were all lodged and kept in the company's offices at Durmid, Campbell county, Va., and adhered to the company's office at that place, and their actual situs had always been there. In other words, the authorities, some of which are cited, pro and con, in the instant case, are reviewed in the case just cited, and the tax in question there was upheld upon the ground that the facts in the case brought it under the recognized exception to the rule that intangible property is taxable at the owner's domicile—that is, where a corporation or person residing in one State has an agent in another, who conducts the business of his principal, and has notes, or other evidences of credit in his hands for collection or renewal, with the view of keeping up a permanent business—then the actual situs of the evidences of

credit would be the place of taxation. That is not the case now under review. Here it does not appear that any part of the transactions constituting a negotiation of the evidences of credit assessed for taxation against Jamison, of which he complains, were conducted within the State either by him in person or by an agent on his behalf. As observed, Jamison never came to the county of Page in connection with these loans, or any of them, except in cases in which either the borrower or the latter's agent had applied to Jamison in Maryland for a loan and he being uncertain as to the value of the security offered came to the county of Page to look over the property for himself.

Landram, in no single instance, according to the evidence, acted as the agent for Jamison in the negotiation of a loan. On the contrary he is shown to have acted in such instances as agent of the proposed borrower in soliciting for him the loan from Jamison. That he may have, at Jamison's request, examined some of the titles to real estate security offered, or that, upon the payment of the loan, he, acting under specific authority for that purpose, relased the lien, falls far short, as it appears to us, of constituting him the agent for Jamison in the conduct of a localized business, such as is essential to uphold the tax in question.

Not only so, and aside from the question of the power of the State to impose the tax, irrespective of the business upon which alone, as we have seen, the tax is sought to be upheld, the State has not, as we view the statute, attempted to impose such tax. The statute, *supra*, reads: "The provisions of this section of this schedule shall apply with equal force *to any person* or corporation, *representing in this State* business interests that may claim a domicile elsewhere, the intent and purpose being that no non-resident person or corporation, either *personally* or *through an agent*, shall *transact business here without* paying to the State a corresponding tax with that exacted of its own citizens,

and all bills receivable  *  *  *  arising from the business in this State are hereby assessable within this State and at the business domicile of said non-resident person or corporation, his or its agent or representative." (Italics ours.) Clearly the statute contemplates the establishing in this State of a "business" and in the case of an individual, as in this case, personally conducted by him or through an agent domiciled in the State. Manifestly the tax is not sought to be imposed as one upon the business, but upon the person representing in this State the foreign interests whose business is "here" conducted by such person; that is, where the business is conducted "here" by the non-resident, either in person or by an agent, and when he or his agent has acquired a domicile here, the tax is imposed. If this were not true, a non-resident who had made a single loan in this State, evidenced by a note or bond, secured by deed of trust on land or otherwise, would be liable to be taxed on the evidence of the loan or credit, although the lender of the money took the evidence of the credit to his domicile in another State and paid taxes on it there. It cannot be maintained that the Page Valley National Bank should be treated as the agent of Jamison "in the conduct of the business," sought to be taxed, for the record only shows that certain of the debtors in loans made by Jamison in Page county deposited to the credit of Jamison in that bank the amounts due him and that the bank merely remitted the same to Jamison, so that if the bank was the agent of any person, it was the agent of the debtor and not of Jamison. In *Pendleton* v. *Commonwealth*, 110 Va. 229, 65 S. E. 536, it was held that a non-resident's deposit in bank creates the relation of debtor and creditor between the bank and the depositor, and is not taxable against the latter, a non-resident of this State.

In any view to be taken of the instant case, it is not sufficiently clear that the purpose and intent of the statute in-

voked to warrant the assessment of the tax in question is to impose such a tax, and hence there is, at least, doubt that such was the intent and purpose of the statute, in which event the doubt is to be absolved in favor of Jamison against whom the tax is assessed.

"Laws imposing a license or a tax are strictly construed and whenever there is doubt as to the meaning or scope of such laws they are construed more strongly against the government and in favor of the citizen." *Brown* v. *Commonwealth,* 98 Va. 366, 36 S. E. 485; *Supervisors* v. *Talbott,* 96 Va. 723, 32 S. E. 479.

For the foregoing reasons, we are of opinion that the circuit court erred in denying to Jamison, appellant here, the relief sought by him in this proceeding and its judgment will be reversed and this court will enter the order which the circuit court should have entered, relieving Jamison, the appellant, from the payment of the taxes assessed against him, of which he complains.

*Reversed.*